AO 91 (REV.5/85) Criminal Complaint

AUSA VERSEMAN 815-987-4444

**UNITED STATES DISTR**
NORTHERN DISTRICT O
WESTERN DIVISI

07 CR 50049
Judge Kapala
Magistrate Judge Mahoney

UNITED STATES OF AMERICA

v .

JOHN M. VOLPENTESTA

**CRIMINAL COMPLAINT**

CASE NUMBER:    0 7 C R 5 0 0 4 9

(Name and Address of Defendant)

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief. On or about January 31, 2004, in McHenry County, in the Northern District of Illinois, Western Division, and elsewhere, JOHN M. VOLPENTESTA, defendant herein, (Track Statutory Language of Offense)

who during the fourth quarter of the year 2003, ending December 31, 2003, deducted and collected from the total taxable wages of the employees of Volpentesta Construction, Inc. ("VCI") federal income taxes, social security taxes, and Medicare taxes in the sum of $22,740.63, did willfully fail to truthfully account for and pay over to the Internal Revenue Service said federal income taxes, social security taxes, and Medicare taxes that were due and owing to the United States of America for said quarter ending December 31, 2003;

in violation of Title _____26_____, United States Code, Section(s) __7202_____. I further state that I am a Special Agent with the Internal Revenue Service–Criminal Investigation Division ("IRS-CID") and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

FILED

SEP 2 5 2007

Magistrate Judge P. Michael Mahoney
U.S. DISTRICT COURT

Signature of Complainant
AVLE S. NIMTZ
IRS-CID Special Agent

Sworn to before me and subscribed in my presence,

September 25, 2007
Date

at    Rockford, Illinois
City and State

P. MICHAEL MAHONEY, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

UNITED STATES OF AMERICA          )
                                  )          SS
NORTHERN DISTRICT OF ILLINOIS     )

## AFFIDAVIT

I, AVLE S. NIMTZ, personally appearing before United States Magistrate Judge P. Michael Mahoney and being duly sworn on oath, state as follows:

1.       I am a Special Agent with the Internal Revenue Service – Criminal Investigation Division ("IRS–CID").

2.       I have been assigned to investigate allegations that John M. Volpentesta ("Volpentesta") has committed various federal criminal tax crimes, including failing to pay over to the IRS federal employment taxes collected from employees of Volpentesta Construction Inc. ("VCI"), a construction business that Volpentesta owned and operated, and failing to file personal income tax returns.

3.       I am aware that the Rockford Office of the Federal Bureau of Investigation ("FBI") is investigating allegations that John M. Volpentesta committed various federal fraud crimes, including violations of the mail fraud and wire fraud statutes. Specifically, the FBI is investigating allegations that Volpentesta defrauded various home buyers whom VCI had contracted with to build homes. In addition, the FBI is investigating allegations that Volpentesta defrauded various individuals who invested money in VCI and/or who loaned money to VCI.

4.       IRS-CID and FBI have joined their investigations of John M. Volpentesta and are assisting each other with these respective investigations.

5.       The information contained in this affidavit is based upon witness interviews I personally conducted, witness interviews conducted by other federal agents, my personal examination of various documents, and the examination of various documents by other federal

agents. For the witness interviews and records examinations conducted by other agents, I have spoken to the agents about their interviews and examinations and/or read their reports concerning these matters.

6.     I have examined a copy of the Articles of Incorporation for VCI that was filed with the Illinois Secretary of State's Office on February 18, 2003. This document lists John M. Volpentesta as the sole shareholder of VCI.

7.     On December 28, 2005, FBI Special Agent Graig Peterson interviewed Yvette Szpila. Agent Peterson also conducted follow-up interviews of Ms. Szpila on December 29, 2005, and January 10, 2006. Ms. Szpila told Agent Peterson that she was employed by VCI at its offices in Marengo, Illinois, from September 3, 2005, through November 30, 2005. Ms. Szpila was hired to be the office manager for VCI. She was still in training for this position when she resigned on November 30, 2005.

8.     Ms. Szpila described John Volpentesta as the owner of VCI. She further stated that an individual named Thomas Evans ("Evans") assisted Volpentesta in running the company. Ms. Szpila stated that an individual named Melissa Holimon worked as a member of the VCI office staff.

9.     Ms. Szpila stated that the primary reason she resigned from VCI was that Volpentesta was not paying his subcontractors for work performed on homes that VCI was constructing. Ms. Szpila estimated that she received approximately ten phone calls per day from subcontractors demanding money that they were owed. Ms. Szpila further stated that when subcontractors came into the VCI office demanding payment, Volpentesta and Evans often hid in the back portion of the office.

10.    Ms. Szpila stated that, as the VCI office manager, one of her responsibilities included preparing and submitting Contractor's Sworn Statements ("CSSs"). Ms. Szpila said that Holimon also occasionally prepared these CSSs. I have personally reviewed some of these CSSs. These sworn statements listed work performed and/or materials supplied for the construction projects, which company performed the work or supplied the materials, and the cost of the work or materials. I have learned that, for homes that were financed by construction loans, VCI provided the CSSs to the title company in support of requests for the title company to release construction loan funds. For homes financed by the home buyers themselves, VCI provided the CSSs to the home owners in support of requests for the home owners to release funds to pay for the construction.

11.    Ms. Szpila stated that approximately 95% of the time, she received the information necessary to complete the CSSs from Volpentesta. Ms. Szpila estimated that approximately 5% of the time Evans provided her the information needed for the sworn statements.

12.    Ms. Szpila further stated that Volpentesta instructed her and Holimon to place false information on the CSSs. Ms. Szpila also stated that Volpentesta and Evans verbally abused her and Holimon and Evans threatened to physically harm the women if they did not comply with Volpentesta's demands to place false information on the CSSs.

13.    Ms. Szpila informed Agent Peterson that she had access to VCI's records. Based upon her review of these records during the course of her employment, Ms. Szpila believes that VCI was not paying employment taxes to the IRS.

14.    On January 5, 2006, Agent Peterson and I interviewed Melissa Ann Holimon. Ms. Holimon confirmed that she worked at VCI from April of 2005 through November 30, 2005. Ms. Holimon informed us that her duties at VCI included: (1) maintaining the files; (2) opening some

3

of the mail; (3) preparing VCI payroll checks by inputting information into VCI's computer system; and (4) preparing checks for VCI's bill payments.

15.     Ms. Holimon told us that she obtained the information she needed to prepare the VCI payroll checks from weekly time-cards that were prepared by VCI's employees. Ms. Holimon inputted the information from the time-cards into a Quick-Books program. The Quick-Books program determined the pay and withholdings for each employee. Another computer program was used to print the checks. Ms. Holimon advised us that federal and state income taxes, along with FICA taxes, were withheld from employees' paychecks. After the checks were printed, Ms. Holimon stamped Volpentesta's signature on the checks and provided them to Volpentesta for his review.

16.     Ms. Holimon stated that during the last four months she was employed at VCI, subcontractor bills were rarely paid. According to Ms. Holimon, all bills were given to Volpentesta for him to determine which would be paid. Ms. Holimon stated that no payments were made to anyone, other than the employees of VCI, without Volpentesta's specific order.

17.     Ms. Holimon stated that she occasionally prepared the CSSs that were submitted to the title company. Ms. Holimon told us that, on more than one occasion, Volpentesta instructed her to increase the cost amounts listed on the sworn statements, which, in turn, increased the loan draw amount VCI received from the title company.

18.     On January 11, 2006, Agent Peterson and I interviewed Nancy May of Ticor Title Insurance Company in McHenry, Illinois. On April 24, 2006, Agent Peterson conducted a follow-up interview of Ms. May. Ms. May has worked as the escrow agent for several loans for VCI construction projects. Ms. May's work on loans involving VCI and John Volpentesta spanned the time period of approximately January or February of 2003 through early 2006.

4

19.    As an escrow agent, Ms. May is responsible for ensuring proper disbursement of construction loan funds on behalf of banks that are clients of Ticor. Specifically, Ms. May is responsible for ensuring that contractor's claims for work performed on construction projects are properly documented before she disburses the banks' funds to the contractors in payment for that work.

20.    Ms. May informed us that she has received telephone calls from subcontractors who claimed they were never paid for work performed on VCI construction projects. After she received these telephone calls, Ms. May checked the CSSs that VCI had submitted for the projects. Ms. May noted that these sworn statements indicated that VCI had performed the work itself or that other subcontractors performed the work, rather than the subcontractors that called Ms. May. Ms. May informed the subcontractors who called her of the representations contained on VCI's sworn contractor's statements. She further informed these subcontractors that the loan funds for the particular jobs the subcontractors claimed to have performed had already been released to VCI.

21.    Ms. May provided an example of a call she received from a subcontractor who claimed he was never paid for work performed on a VCI project. Ms. May stated that in August of 2005, she received a phone call from a representative of Great Lakes Installation and Roofing. This individual informed Ms. May that Great Lakes Installation and Roofing was owed $7,050 for the installation of a roof for VCI on the home that was being constructed for a couple referred to herein as "Home Buyers A" in Bull Valley, Illinois. McHenry Savings Bank was providing the construction loan for the "Home Buyers A" home. Ms. May further stated that in April 2005, VCI had submitted a CSS to Ticor indicating that VCI had installed the roof on the "Home Buyers A" property. Based upon this CSS, Ticor caused funds to be released from the "Home Buyers A" construction loan at

5

McHenry Savings Bank to VCI in payment for the installation of the roof on the "Home Buyers A" property. According to Ms. May, Great Lakes Installation and Roofing has now filed a mechanic's lien against the "Home Buyers A" property.

22.     On June 12, 2006, Agent Peterson interviewed the couple referred to herein as "Home Buyers A." In November of 2004, "Home Buyers A" hired VCI to construct a house in Bull Valley, Illinois. "Home Buyers A" obtained a construction loan from McHenry Savings Bank to finance the construction of their home. In addition, pursuant to their contract, they provided an additional $80,000 to VCI during the fall of 2004.

23.     "Home Buyers A" told Agent Peterson that there was a problem regarding their $80,000 down payment. In August 2005, "Home Buyers A" noticed that the $80,000 down payment was not referenced anywhere on the CSSs that VCI had submitted in support of requests for partial payments. "Home Buyers A" stated that they spoke to Nancy May about this. Ms. May told them that Volpentesta told her that the $80,000 was not going to be used to pay for budgeted expenses, but was supposed to be used to cover all of the extras and overages on the project. "Home Buyers A" told Agent Peterson that this statement was not true, because VCI had billed them separately for any extras and overages.

24.     In addition to Volpentesta's misuse of their $80,000 for the construction of their home, "Home Buyers A" told Agent Peterson that Volpentesta made several misrepresentations to them regarding what their loan funds and additional payments were being used for. For example, "Home Buyers A" told Agent Peterson that misrepresentation were made to them regarding the billing for their well and septic system. "Home Buyers A" provided to Agent Peterson an invoice from VCI, dated December 31, 2004. "Home Buyers A" stated that they received this invoice via

6

the United States mail. I have examined this invoice. The invoice bills "Home Buyers A" for an overage of $8,900 for the installation of the well and septic system. This invoice indicates that the actual cost of the well and septic system was $17,850, which was higher than the $8,950 contract allowance. I have also examined a copy of a check dated January 10, 2004, from "Home Buyers A" to VCI, in the amount of $8,900, which paid that invoice. In addition, I have examined a copy of a CSS dated March 4, 2005, signed by John Volpentesta on behalf of VCI, which states that "Plant Enterprises" installed the septic system for the "Home Buyers A" home in Bull Valley.

25.    On December 2, 2006, Agent Peterson interviewed David Plant, the owner of Plant Enterprises. Mr. Plant told Agent Peterson that he has never contracted with anyone to perform septic work, nor was he ever asked by Volpentesta to do any septic work. Mr. Plant added that he is not licensed to perform septic work. Furthermore, Mr. Plant stated that he was not paid $8,900 by VCI for work performed on the "Home Buyers A" home.

26.    On February 7, 2007, Agent Peterson interviewed Edmund Karls, the owner of Lake Cook Trenching, Inc. Mr. Karls told Agent Peterson that Lake Cook Trenching was hired by VCI to install the septic system for the "Home Buyer A" home in Bull Valley. Mr. Karls further stated that Lake Cook Trenching installed the septic system on August 25, 2005 and billed VCI $6,400, which was the amount of their bid to VCI. Mr. Karls further stated that, despite repeated requests, VCI never paid Lake Cook Trenching. Mr. Karls also said that Lake Cook Trenching eventually filed a mechanic's lien against the "Home Buyers A" home. During the winter of 2005-2006, Mr. Karls contacted "Home Buyers A." "Home Buyers A" then directly paid Lake Cook Trenching the $6,400 that was owed for the septic job and Lake Cook Trenching released its lien against the home.

7

27.    During the interview of "Home Buyers A," they told Agent Peterson that when they learned that Lake Cook Trenching had installed their septic system for only $6,400, they contacted Volpentesta and asked what he had done with their $8,900. Volpentesta responded that he was going to use the $8,900 to install a stone driveway at the "Home Buyers A" home. "Home Buyers A" responded that they did not want a stone driveway and demanded their $8,900 back. Volpentesta never returned their $8,900 and VCI never installed a stone driveway at the "Home Buyers A" home.

28.    I have examined another CSS, dated April 25, 2005, signed by John Volpentesta, for the "Home Buyers A" home. This CSS was submitted to Ticor to request payment for various jobs performed on the "Home Buyers A" home, including a request for payment of $8,000 for the installation of the roof. According to this CSS, the roof was installed by VCI. I have also examined a "Partial Waiver of Lien and Contractor's Affidavit," dated April 28, 2005, signed by John Volpentesta on behalf of VCI, in which VCI releases any right to file a lien against the "Home Buyers A" home for "roofing" work. In response to this CSS and lien waiver, Ticor paid the requested funds to VCI, including the $8,000 for the installation of the roof.

29.    When they were interviewed, "Home Buyers A" told Agent Peterson that sometime after Ticor paid VCI for the roofing on their home, they later learned that a company called Great Lakes Installation installed the roof on their home in April of 2005 for a cost of $6,050. "Home Buyers A" further stated that Great Lakes Installation was never paid by VCI for their work on the "Home Buyers A" home and filed a mechanic's lien against the property.

30.    I have examined a copy of another VCI invoice, dated July 6, 2005, to "Home Buyers A." "Home Buyers A" told Agent Peterson that they received this invoice via the United States mail. This invoice bills "Home Buyers A" for various overages, including a $17,673.52 overage for

8

cabinets. I have also examined copies of two checks, dated July 7, 2005, signed by "Home Buyers A," which paid the July 6, 2005 invoice.

31.    When they were interviewed, "Home Buyers A" told Agent Peterson that after they paid VCI for the cabinet overage, they later learned that VCI had not paid these funds to Coletta Elaine, the cabinet supplier. "Buyers A" further stated that Coletta Elaine refused to deliver the cabinets until they were paid. As a result, "Buyers A" stated that they paid Coletta Elaine directly an additional $17,673.52, plus storage fees.

32.    "Home Buyers A" told Agent Peterson about several other fraudulent acts by Volpentesta.

33.    On June 16, 2006, "Home Buyers A" faxed Agent Peterson a document summarizing the losses they have sustained as a result of fraudulent acts of Volpentesta. The total loss figure is $165,033.93. This figure includes: (1) their $80,000 down payment, which was never accounted for; (2) $55,255.41 in funds paid out from their construction loan to VCI for work actually done by other subcontractors and for materials not used on their home, which funds were never paid to the subcontractors and suppliers; and (3) $29,778.52 in payments made separately by "Home Buyers A" on invoices for alleged "overages," such as septic and cabinets.

34.    On June 7, 2006, Agent Peterson interviewed a couple referred to herein as "Home Buyers B." "Home Buyers B" told Agent Peterson that in March of 2005, they were looking to purchase a home. While looking at VCI's website, they saw a "spec" house that VCI stated was constructing in Lake Zurich, Illinois. After meeting with Volpentesta, "Home Buyers B" signed a contract to purchase the house in Lake Zurich from VCI for $550,000. Between March and May of

9

2005, "Home Buyers B" provided a total down payment of $100,000 to VCI. VCI obtained a construction loan from Home State Bank to finance the remainder of the construction.

35.     "Home Buyers B" further told Agent Peterson that after construction started, VCI sent invoices to them for alleged "overages." At least some of these invoices were sent via the United States mail. "Home Buyers B" stated that they initially paid these invoices.

36.     "Home Buyers B" also told Agent Peterson that they initially refused to pay the October 19, 2005 invoice. This invoice billed "Home Buyers B" a 15% builders fee on the prior invoices. "Home Buyers B" stated that they refused to pay this invoice, because their contract did not provide for a 15% builders fee. "Home Buyers B" stated that after they refused to pay this invoice, Volpentesta stopped all construction on their house. Ultimately, "Home Buyers B" gave in and paid the builder's fee invoice in December 2005.

37.     "Home Buyers B" further stated that they believed that Volpentesta was trying to back out of his contract with them and sell their house at a higher price. In August or September 2005, "Home Buyers B" visited the VCI website. They saw that their house was listed for sale by VCI at a price of $825,000.

38.     "Home Buyers B" further told Agent Peterson that they had discovered that several of the subcontractors did not get paid for the work they performed on their house.

39.     On June 30, 2006, Agent Peterson caused a search to be performed at the Lake County Recorder of Deeds office for liens against the "Home Buyers B" property in Lake Zurich. This search revealed numerous mechanic's liens filed against the property, including the following: (1) Allied Drywall – $4,461.67; (2) Unique Building Solutions – $5,960; (3) Maple Street

10

Excavating – $6,000; (4) Cutting Edge Carpets – $8,958.80; (5) Amron Stairs – $5,080; (6) Top Side Roofing – $1,564.75; and (7) Parker Mechanical Contractors – $7,961.

40.     On May 25, 2006, Agent Peterson interviewed a couple referred to herein as "Home Buyers C." In March of 2004, "Home Buyers C" bought a residential lot located on Roselle Road in Inverness, Illinois. In June of 2004, "Home Buyers C" signed a contract with VCI for VCI to build a house on their lot. "Home Buyers C" provided a total down payment of $50,000 to VCI. They obtained a construction loan from Harris Bank to finance the remainder of the construction.

41.     "Home Buyers C" told Agent Peterson that after construction began, Volpentesta billed them for numerous alleged "overages." I have reviewed copies of VCI invoices to "Home Buyers C" and the checks which paid these invoices. These records reflect that "Home Buyers C" paid VCI over $200,000 on these invoices.

42.     "Home Buyers C" told Agent Peterson that they later learned that VCI had not paid the subcontractors and suppliers for work performed and materials supplied for their home. For this reason, and for various other breaches of their contract, they fired VCI in April of 2006. Their home had still not been completed by that date.

43.     "Home Buyers C" further told Agent Peterson that they discovered that a substantial amount of payments which they had made to VCI had not been used by VCI to pay the subcontractors and suppliers who worked on, and provided materials for, their home. "Home Buyers C" stated that after they fired VCI, they were required to spend an additional $197,846.54 to clear all of mechanic's liens from the title to their home.

44.     I have examined a CSS, dated February 20, 2006, signed by John Volpentesta, for the "Home Buyers C" home in Inverness. This CSS indicates that a company called "Stock Lumber"

11

was to provide the rough lumber for the home at a contract price of $49,369.97, and that $48,265.05 had been paid to date for the rough lumber.

45.    On November 28, 2006, Agent Peterson interview Dan Scott of Stock Lumber. Mr. Scott told Agent Peterson that Stock Lumber supplied lumber for four homes being built by VCI, including the "Home Buyers C" home. According to Mr. Scott, as of Nov. 2006, VCI owed Stock Lumber $126,179.58 for lumber supplied on those four homes. Mr. Scott stated that the figure had been approximately $175,000, but "Home Buyers C" had paid Stock directly approximately $50,000 that Stock was owed for materials supplied for their house.

46.    On December 5, 2006, I interviewed "Home Buyers D." In April of 2004, "Home Buyers D" located a lot in Kildeer, Illinois, that they wished to build a home on. In May of 2004, "Home Buyers D" signed a contract with Volpentesta for VCI to build a home on that lot. "Home Buyers D" made a down payment of $52,000 to VCI. In September of 2004, they paid VCI an additional $20,000 for a change order that increased the square footage of the home. VCI obtained a construction loan from Home State Bank for construction of the "Home Buyers D" house in Kildeer.

47.    "Home Buyers D" told me that during the early stages of construction, they met with Volpentesta at the construction site on several occasions on Friday afternoons. During several of these meetings, Volpentesta provided them with invoices. These invoices billed "Home Buyers D" for real estate taxes and the interest on VCI's loan from Home State Bank.

48.    "Home Buyers D" told me that at some point, they told Volpentesta that they were no longer going to reimburse VCI for the interest on VCI's loan and the tax payments, because their contract did not require them to make additional payment for these items. According to "Home

12

Buyers D," Volpentesta admitted that the contract did not require them to make additional payments to cover interest and real estate taxes. Volpentesta also admitted that they should not have been invoiced for these amounts. "Home Buyers D" then asked Volpentesta to return the amounts they had previously paid to him for interest and taxes. Volpentesta refused, stating that it was their problem, since they had already paid VCI.

49.    "Home Buyers D" also told me that they discovered that many of the subcontractors who performed work on their house were not paid. They further stated that some of these subcontractors had filed liens against their house.

50.    I have examined Ticor's records relating to Home State's loan to VCI for the "Home Buyers D" house in Kildeer. Included in these records is a CSS dated August 17, 2005, signed by John Volpentesta, for the "Home Buyers D" house. This CSS indicates that VCI performed the excavating work for the "Home Buyers D" house and requested a payment of $6,500 for that excavating work. I have also examined a "Partial Waiver of Lien and Contractor's Affidavit," dated August 17, 2005, signed by John Volpentesta on behalf of VCI, in which VCI releases any right to file a lien against the "Home Buyers D" home for "excavation" work. In response to this CSS and lien waiver, Ticor paid the requested funds to VCI, including the $6,500 for the excavating work.

51.    I have also examined a copy of a mechanic's lien against the "Home Buyers D" property that was filed with the Lake County Recorder of Deeds Office on August 12, 2005. This mechanic's lien was filed by a company called Maple Street Excavating. In this lien, Maple Street Excavating asserts that it performed the excavating work for the "Home Buyers D" house in Kildeer, pursuant to subcontract with VCI, and that VCI failed to pay Maple Street Excavating any of the $7,300 owed for that work.

13

52.    On August 11, 2006, Agent Peterson interviewed a representative of a company referred to herein as "Commercial Customer A." Agent Peterson conducted a follow-up interview with "Commercial Customer A's" representative on May 22, 2007. In March of 2005, "Commercial Customer A" entered into a contract with VCI for VCI to perform the renovation work on the "Commercial Customer A's" facility in Countryside, Illinois. The contract price for this renovation work was $98,619.

53.    "Commercial Customer A's" representative also stated that he had several telephone conversations with Volpentesta and Evans during the course of the contract. During these calls, Volpentesta and Evans attempted to convince "Commercial Customer A's" representative that the renovation work was progressing well and that "Commercial Customer A" should make partial payments to VCI under the contract. "Commercial Customer A's" representative stated that because he works out of an office located in Wisconsin, he would have been in Wisconsin at the time of these calls.

54.    I have examined a copy of "Commercial Customer A's" representative's telephone call log. This log indicates that "Commercial Customer A's" representative conducted a telephone call on August 8, 2005, with "John at VCI."

55.    I have examined copies of four checks from "Commercial Customer A" payable to VCI. These checks show that "Commercial Customer A" paid VCI a total of $101,265 on this contract. The date of last payment was September 19, 2005.

56.    "Commercial Customer A's" representative told Agent Peterson that he went to Countryside, Illinois, on October 7, 2005, to personally inspect the progress of the work. The project was still not done at that time. At that point, "Commercial Customer A" fired VCI.

14

57.     "Commercial Customer A's" representative stated that after they fired VCI, they learned that VCI had not paid several of the subcontractors who worked on the project. He further told Agent Peterson that these subcontractors were owed about $17,000. "Commercial Customer A's" representative identified one of these unpaid subcontractors as "AC Sprinkler, Inc.," and further stated that A.C. Sprinkler had filed a lien against the property for approximately $7,450.

58.     On February 27, 2007, I interviewed Dave Mitchell, the owner and operator of AC Sprinkler. Mr. Mitchell confirmed that AC Sprinkler was hired by VCI to install the sprinkler system for the "Commercial Customer A" job. Mr. Mitchell further stated that AC Sprinkler did install the sprinkler system and submitted a bill to VCI for $7,450, which was the amount of the proposal that AC Sprinkler had originally submitted to VCI. Mr. Mitchell stated that VCI never paid AC Sprinkler for the work done on the property and that AC Sprinkler filed mechanic's lien against the property in the amount of $7,450.

59.     On June 19, 2006, Agent Peterson conducted a telephonic interview of a person referred to herein as "Investor A." "Investor A" resides in Alexandria, Virginia. "Investor A" told Agent Peterson that in 2005, she and her daughter were interested in purchasing a home in the Chicago area. In August or September of 2005, they found VCI on internet. They called VCI and arranged a meeting with Volpentesta.

60.     "Investor A" told Agent Peterson that during their meeting, she told Volpentesta that she also might be interested in purchasing some property as an investment. Volpentesta responded that he was working on a development in Barrington, Illinois, and showed "Investor A" some drawings for a project known as "Country Creek Subdivision." According to "Investor A," Volpentesta stated that he owned all of the lots and they were ready to be built on.

15

61.     Volpentesta suggested that "Investor A" purchase Lot 17 of Country Creek Subdivision for $350,000. Volpentesta told "Investor A" that the price of this lot was going to increase to $450,000 in January of 2006. On October 29, 2005, "Investor A" signed a contract to purchase Lot 17. "Investor A" provided a down payment of $100,000 to Volpentesta for this purchase.

62.     "Investor A" further told Agent Peterson that in November 2005, Yvette Szpila from VCI called her and stated that someone was interested in purchasing Lot 17 for $425,000. Ms. Szpila asked "Investor A" if she was interested in selling at that price and "Investor A" responded that she was.

63.     "Investor A" further told Agent Peterson that on December 28, 2005, she called Volpentesta and asked about the status of the sale of Lot 17. "Investor A" stated that she placed this call while she was in Virginia. I have examined a copy of "Investor A's" telephone records and identified a ten minute telephone call on December 28, 2005, to a telephone number registered to VCI in Illinois. "Investor A" stated that during this telephone call, Volpentesta told her that the closing was going to occur in late January 2006.

64.     On August 3, 2006, Agent Peterson interviewed Dominic Buttitta. Mr. Buttitta stated that he owns the land where Country Creek Subdivision was to be located, and that he has owned that land for the last ten years. Mr. Buttitta stated that although both Forum Properties and John Volpentesta had been given options to buy, neither Forum nor Volpentesta ever came up with the money to purchase the land and the proposed deals fell through.

16

65.    When she was interviewed on June 19, 2006, "Investor A" told Agent Peterson that Volpentesta never returned to her the $100,000 down payment she had given him for the purchase of Lot 17 of Country Creek Subdivision.

66.    On July 5, 2006, Agent Peterson interviewed a person referred to herein as "Investor B." "Investor B" stated that around the beginning of December 2005, he was introduced to Volpentesta. Shortly after they met, Volpentesta told "Investor B" about Country Creek Subdivision. According to "Investor B," Volpentesta stated that he had a contract to purchase the land where Country Creek Subdivision would be located. Volpentesta told "Investor B" that this deal would be closing on January 31, 2006.

67.    "Investor B" further told Agent Peterson that Volpentesta offered to allow him to purchase some of the lots in Country Creek Subdivision as an investment. "Investor B" stated that he agreed to purchase eight lots for $2.345 million. On January 6, 2006, "Investor B" made a down payment of $300,000 to Volpentesta.

68.    When he was interviewed on July 5, 2006, "Investor B" stated that the closing for the property had still not occurred. In addition, "Investor B" stated that he had not received his $300,000 back from Volpentesta. "Investor B" further stated that when he asked Volpentesta where his $300,000 was, Volpentesta refused to give him an explanation.

69.    On August 28, 2006, Agent Peterson interviewed a person referred to herein as "Investor C." "Investor C" stated that in April of 2005, he saw an advertisement in the Chicago Tribune for investments which promised a 12.5 % to 15% return. "Investor C" called the telephone number listed in the ad and spoke to Volpentesta. Volpentesta told "Investor C" that he was a builder of shopping centers, strip malls, and high-end homes.

17

70.     "Investor C" further stated that in May of 2005, he went to Volpentesta's office in Marengo, Illinois. During this meeting, Volpentesta and "Investor C" discussed the possibility of "Investor C" making a loan to VCI. "Investor C" told Volpentesta that he would not make a loan without security. As the meeting progressed, Volpentesta took "Investor C" out and showed him some properties. One of the properties Volpentesta showed "Investor C" was a commercial property on North Highway 47 in Huntley, Illinois. Volpentesta told "Investor C" that although a bank had a first lien against the property for $250,000, the property was worth between $500,000 and $750,000. Volpentesta suggested that the equity in this property could be used to secure "Investor C's" loan.

71.     "Investor C" told Agent Peterson that he asked Volpentesta for references. Volpentesta provided "Investor C" with the name of an individual and "Investor C" called that person. The person stated that, to date, Volpentesta had made timely payments on that individual's loan. "Investor C" also stated that he independently verified the value of the property on North Highway 47 and determined there was enough equity in the property to secure a $200,000 loan.

72.     "Investor C" agreed to loan VCI $200,000. The loan closing was set for May 26, 2005. The loan closing was conducted at the offices of a McHenry County mortgage broker. "Investor C" stated that it was agreed that the mortgage broker would file "Investor C's" lien against VCI's property on North Highway 47 in Huntley.

73.     "Investor C" told Agent Peterson that a couple of months after the closing, he checked with the McHenry County Recorder of Deeds office and found out that his lien against VCI's property on North Highway 47 had never been filed. "Investor C" called the mortgage broker and left messages, but the mortgage broker never returned his telephone calls. In November or

18

December of 2005, "Investor C" finally filed the lien himself. According to "Investor C," by this point it was too late: Volpentesta had received another loan from McHenry Savings Bank and used the property on North Highway 47 as security for that loan. As a result, "Investor C's" lien was third in line and there was not enough remaining equity to adequately secure his loan.

74.    "Investor C" further stated that VCI made payments on the loan until November 2005, and then defaulted. As of August 28, 2006, "Investor C" had not received his $200,000 principal back from VCI.

75.    On September 14, 2006, I interviewed a person referred to herein as "Investor D." In January 2003, "Investor D" signed a contract with Volpentesta, acting on behalf of VCI, to purchase and finish a partially completed, high-end residence located on Old Sutton Road in Barrington, Illinois. Under this contract, "Investor D" agreed to supply the money to purchase the residence. "Investor D" also agreed to fund VCI's work on the residence by reimbursing VCI for time and materials expended on the project. Once the residence was completed, the contract called for VCI and "Investor D" to split the profits from the sale of the residence.

76.    On December 12, 2006, I interviewed Michael Brunschon. Mr. Brunschon was formerly employed by VCI and was assigned by VCI to work on the completion of the residence located on Old Sutton Road. Mr. Brunschon informed me that he and a couple of other VCI workers were instructed to move approximately 273 sheets of plywood from the Old Sutton Road job site to the job site of a strip mall in Marengo, Illinois, that was being constructed by VCI. According to Mr. Brunschon, the plywood from the Old Sutton Road project was used to construct the roof of the strip mall. The strip mall was owned by John Volpentesta doing business as "State Street Plaza." Mr. Brunschon further stated that after the plywood was removed from the Old Sutton Road project, new

19

plywood of the exact same type and specifications was ordered from a lumber company and delivered to the Old Sutton Road work site.

77.     On July 25, 2007, I interviewed Pedro Garcia. Mr. Garcia was formerly employed by VCI and was assigned by VCI to work on the completion of the residence located on Old Sutton Road. Mr. Garcia informed me that he was one of the workers who was instructed to move the plywood from the Old Sutton Road job site to the strip mall job site. Mr. Garcia further stated that it was Volpentesta who instructed him to move this plywood. Mr. Garcia confirmed that this plywood was used to complete the roof of the strip mall.

78.     During the interview on September 14, 2006, "Investor D" told me that after VCI had been working on the Old Sutton Road project for approximately six to eight months, "Investor B" began receiving notices of liens that had been filed by subcontractors and suppliers who had worked on the project or supplied materials for it. "Investor D" had previously paid VCI for the work done by these subcontractors. When "Investor D" asked Volpentesta about the lien notices, Volpentesta responded that he had paid the subcontractors and that the lien notices were a mistake. "Investor D" asked Volpentesta to provide documentation of his payments to these vendors, but Volpentesta never provided this documentation. As a result, "Investor D" was forced to pay the subcontractors and suppliers directly in order to clear their mechanic's liens from the title to the property.

79.     On April 27, 2006, a federal search warrant was executed at the offices of VCI in Marengo, Illinois. In addition, records for the corporate bank accounts of VCI and the personal bank accounts of Volpentesta were obtained via subpoenas from the respective banks. Further, the records of Darlene Martens, an accountant hired by Volpentesta and VCI, were obtained via subpoena. I

Case 3:07-cr-50049   Document 1   Filed 09/25/2007   Page 22 of 24

have personally examined these records. In addition, IRS Revenue Agent George Murray has assisted me in examining and analyzing these records.

80.     On April 3, 2006, I caused a search to be performed of IRS' official records. This search revealed that John M. Volpentesta has not filed personal federal income tax returns for the years 2003, 2004, and 2005.

81.     Pursuant to federal statute, individuals using the married filing separately status were required to file a personal federal income tax return if their gross income met the following thresholds in the respective years: (1) 2003 – $3,050; (2) 2004 – $3,100; and (3) 2005 – $3,200. Individuals using the married filing jointly status were required to file a personal federal income tax return if their gross income met the following thresholds in the respective years: (1) 2003 – $15,600; (2) 2004 – $15,900; and (3) 2005 – $16,400.

82.     The examination of the records performed by myself and Revenue Agent Murray revealed that for the years 2003, 2004, and 2005, Volpentesta's gross income substantially exceeded the filing requirements for both the married filing separately and married filing jointly statuses. Revenue Agent Murray and I calculated Volpentesta's income for these three years by: (1) adding all VCI salary checks to Volpentesta during this time period; (2) adding all transfers to Volpentesta from VCI's corporate accounts; (3) subtracting all transfers from Volpentesta to VCI; and (4) adding all payments of Volpentesta's personal expenses from the VCI corporate accounts. This process revealed that Volpentesta's gross income was as follows in the respective years: (1) 2003 – $375,853.01; (2) 2004 – $156,844.95; and (3) 2005 – $193,833.53.

83.     Pursuant to federal statutes, all employers are required to deduct the following from the wages of their employees: (1) federal income taxes (2) social security taxes; and (3) Medicare

taxes. Treasury Regulations and Revenue Procedures further require employers, on a quarterly basis, to account for the taxes withheld from the wages of their employees by filing IRS Form 941 returns, and to pay over to the IRS all taxes withheld from the wages of their employees.

84.     On April 3, 2006, I caused a search to be performed of IRS' official records.  This search revealed that for each quarter of the years 2003, 2004, and 2005, VCI has not filed Form 941 returns, and has not paid over to the IRS any federal income taxes, social security taxes, and Medicare taxes withheld from the wages of VCI employees.

85.     The examination of the records performed by Revenue Agent Murray and me revealed that VCI withheld federal income taxes, social security taxes, and Medicare taxes from the wages of VCI employees during the first three quarters of 2003, and all four quarters of both 2004 and 2005.  For the year 2003, Revenue Agent Murray and I examined IRS Forms W-2 that accountant Martens prepared for VCI's employees.  For the years 2004 and 2005, Revenue Agent Murray and I examined copies of the pay stubs for the paychecks issued to VCI's employees, the payroll register from VCI's Quickbooks computerized accounting system, and records from VCI's corporate bank accounts.  Our examination revealed that VCI withheld the following total amounts from the wages of VCI's employees for the respective quarters: (1) 2nd quarter 2003 – $8,998.10; (2) 3rd quarter 2003 – $20,413.50; (3) 4th quarter 2003 – $22,740.63; (4) 1st quarter 2004 – $19,398.54; (5) 2nd quarter 2004 – $12,897.78; (6) 3rd quarter 2004 – $11,155.86; (7) 4th quarter 2004 – $8,712.70; (8) 1st quarter 2005 – $8,202.77; (9) 2nd quarter 2005 – $18,772.10; (10) 3rd quarter 2005 – $17,525.06; and (11) 4th quarter 2005 – $16,182.54.

86.     In reviewing the records obtained from the search warrant, I located IRS Forms 941 for the 2nd, 3rd, and 4th quarters of 2003.  These forms listed the amounts of federal income taxes,

22

social security taxes, and Medicare taxes withheld by VCI from the wages of VCI's employees for each of those quarters. Attached to each these Forms 941 was a VCI check for the amount due to the IRS and an envelope addressed to the IRS. During an interview on June 15, 2006, Darlene Martens told me that she prepared each of these Forms 941 for the 2nd, 3rd, and 4th quarters of 2003. Ms. Martens further informed me that she provided each one of these forms, together with the checks and accompanying envelopes, to Volpentesta. She further stated that she gave Volpentesta instructions on when and how to file the forms.

87.     This affidavit does not contain all of the facts currently known by myself and other law enforcement officers regarding federal criminal fraud and tax violations by John M. Volpentesta. The sole purpose of this affidavit is to set forth sufficient facts to establish probable cause to support the attached criminal complaint.

AVLE S. NIMTZ
Special Agent
Internal Revenue Service Criminal Investigation Division

SUBSCRIBED AND SWORN to before me this 25th day of September, 2007.

P. MICHAEL MAHONEY
United States Magistrate Judge

23